IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D14-0873

AMERISURE MUTUAL
INSURANCE COMPANY,

     Appellant,

v.

FLORIDA DEPARTMENT OF
FINANCIAL SERVICES,
DIVISION OF WORKERS'
COMPENSATION,

     Appellee.

_____/

Opinion filed January 2, 2015.

An appeal from an order of the Department of Financial Services.

Maria Elena Abate and Sharlee Hobbs Edwards of Colodny, Fass, Talenfeld, Karlinsky, Abate & Webb, P.A., Fort Lauderdale, for Appellant.

Richard T. Donelan, Jr., Chief Counsel, Michael H. Davidson, Assistant General Counsel, and David Hershel, Assistant General Counsel, Tallahassee, for Appellee.

BENTON, J.

     Amerisure Mutual Insurance Company (Amerisure) appeals a final order of the Florida Department of Financial Services, Division of Workers' Compensation (Department). We affirm. We reject appellant's contention that the Department

ignored the findings of fact the administrative law judge (ALJ) made and improperly substituted its conclusions of law for those of the ALJ. The Department correctly applied the governing statute.

As an insurance carrier authorized to transact a workers' compensation line of business in Florida, Amerisure is subject to certain assessments: Amerisure is required to pay quarterly assessments to the Special Disability Trust Fund (SDTF) pursuant to section 440.49(9), Florida Statutes (2008), which provides in part:

> (9) SPECIAL DISABILITY TRUST FUND.—
> . . . .
> (b)1. The Special Disability Trust Fund shall be maintained by annual assessments upon the insurance companies writing compensation insurance in the state, . . . which assessments shall become due and be paid quarterly at the same time and in addition to the assessments provided in s. 440.51. . . .
> . . . .
> 3. The net premiums written by the companies for workers' compensation in this state . . . are the basis for computing the amount to be assessed as a percentage of net premiums. Such payments shall be made by each carrier and self-insurer to the department for the Special Disability Trust Fund in accordance with such regulations as the department prescribes.

Amerisure is also required to pay quarterly assessments to the Workers' Compensation Administration Trust Fund (WCATF) pursuant to section 440.51(1), Florida Statutes (2008), which provides in part:

> Expenses of administration.—

(1)  The department shall estimate annually in advance the amounts necessary for the administration of this chapter . . . .

(a)  The department shall, by July 1 of each year, notify carriers and self-insurers of the assessment rate . . . .

(b)  The total expenses of administration shall be prorated among the carriers writing compensation insurance in the state and self-insurers.  The net premiums collected by carriers and the amount of premiums calculated by the department for self-insured employers are the basis for computing the amount to be assessed. . . .

. . . .

(5)  Any amount so assessed against and paid by an insurance carrier . . . shall be allowed as a deduction against the amount of any other tax levied by the state upon the premiums, assessments, or deposits for workers' compensation insurance on contracts or policies of said insurance carrier . . . .  Because deductions under this subsection are available to insurance carriers, s. 624.5091 does not limit such deductions in any manner.

(Boldface omitted.)  Also applicable and pertinent to determination of a carrier's assessments for these trust funds is section 624.5094, Florida Statutes (2008), which provides:

Casualty insurance premiums.—Notwithstanding any statutory provision to the contrary, for the purposes of calculating the annual assessments for the Special Disability Trust Fund under s. 440.49 and expenses of administration under s. 440.51, any amount paid or credited as dividends or premium refunds in the same calendar year by the insurer to its policyholders must be deducted from "net premium," "net premiums written," "direct premium," and "net premium collected" for the calendar year. Such offset for dividends or premium refunds paid or credited for the current year must be

3

> applied against the current year's net premium for that year's assessment regardless of the policy year for which the dividends or premium refunds are being reimbursed.

(Boldface omitted.) The Division of Workers' Compensation (Division) generated a one-page form (never promulgated as a rule) for carriers' use in reporting net premiums and calculating quarterly assessments for the two trust funds. The form provided a space for the carrier to indicate whether net premium was positive or negative for the quarter and in what amount.

The form also had a space for carrying forward "debits" or "credits" from prior quarters and aggregating them with the current quarter's net premium and assessment due. The initial premium for a workers' compensation policy is based on an estimate of what the insured's payroll and the classification of its employees will be during the coverage period, typically a year. Because assessments for the two trust funds must be paid quarterly, an insurer may overpay an annual assessment when positive net premiums in one or more early quarters are exceeded by negative net premium in subsequent quarter(s) in the same calendar year.

### Amerisure's SDTF Assessments

In 2008, Amerisure reported positive net premium totaling $32,934,173 for the first two quarters of the calendar year and paid SDTF assessments totaling $1,488,624. For the third quarter of 2008, Amerisure reported negative net premium (<$923,750>), and paid no assessment. Based on Amerisure's reported

negative net premium for the third quarter, the Division's form for the fourth quarter of 2008 indicated Amerisure had a "credit" of $41,745.36 for SDTF assessment purposes (determined by multiplying the reported negative net premium for the third quarter by the assessment rate of 0.0452). For the fourth quarter of 2008, Amerisure reported negative net premium (<$1,269,343>) and again paid no assessment. An additional credit of $57,374.30 was calculated for the fourth quarter (the fourth-quarter negative net premium multiplied by the assessment rate of 0.0452).

In this way, Amerisure paid $99,119.66 more in estimated payments (for the first two quarters of 2008) than it owed for its 2008 SDTF annual assessment, and ended the year with a credit reflecting the overpayment. In 2009, Amerisure reported negative net premiums all four quarters and paid no SDTF assessments for any quarter.[1] The form the Division provided Amerisure with which to report

---

[1] On each quarterly form for 2009, the Division indicated increasing "credit" amounts for Amerisure's SDTF assessment. On the form provided Amerisure for the first quarter of 2009, the Division indicated Amerisure had a credit of $99,119.66 (the combined credit for the third and fourth quarters, which equaled the actual amount overpaid during 2008). The form for the second quarter of 2009 indicated Amerisure had a credit for SDTF purposes of $163,401.20. The form for the third quarter of 2009 indicated Amerisure had a credit of $271,089.48. The form for the fourth quarter of 2009 indicated Amerisure had a credit of $379,235.27 (the sum of the $99,119.66 credit based on the 2008 overpayment and the total negative net premium reported for 2009 multiplied by the assessment rate of 0.0452). Amerisure reported negative net premium of $3,237,419 for the fourth quarter of 2009, and takes the position that its "credit" balance should be increased

its SDTF assessment for the first quarter of 2010, reflected a credit of $99,119.66, based on Amerisure's actual overpayment of the 2008 annual assessment, but carried forward nothing for 2009 in which no assessments had been paid.

In 2010, Amerisure reported positive net premium of $828,566 for the first quarter of 2010, resulting in an SDTF assessment of $37,451.18 for the quarter. The Division reduced the $99,119.66 credit by that amount, so that the Division's form for the second quarter of 2010 indicated Amerisure had a credit of $61,668.48. Amerisure reported a positive net premium of $1,282,179 for the second quarter of 2010, resulting in an assessment of $57,954.49 for that quarter. The Division again reduced the (remaining) credit by the amount of the assessment, so the Division's form for the third quarter of 2010 reflected a "Prior Balance Carried Forward" of $3,713.99. Amerisure reported a positive net premium of $937,504.00 for the third quarter, resulting in an assessment of $13,688.00 for the third quarter. Reducing this by the "prior balance carried forward" resulted in an amount due of $9,974.01.[2]

Amerisure's WCATF Assessments

Similarly, in 2008, Amerisure reported positive net premiums for the first three quarters of the calendar year totaling $37,925,003 and paid WCATF

---

by $146,331, for a total "credit" of $525,566 in 2009, even though it paid no assessments that year.

[2] Amerisure continued to report positive net premiums for purposes of the SDTF assessment through June 30, 2012.

assessments totaling $94,813.  For the fourth quarter of 2008, Amerisure reported a negative net premium of $1,271,387, and paid no assessment.  In this way, Amerisure paid $3,178.47 more (in estimated payments during the first three quarters of 2008) than it owed for its 2008 WCATF annual assessment.  In 2009, Amerisure reported negative net premiums in each quarter and paid no WCATF assessments.[3]

On the form provided for Amerisure to report net premium and the assessment for the first quarter of 2010, the Division indicated Amerisure had a credit of $3,178.47 for WCATF purposes—the amount actually overpaid in 2008. Amerisure reported positive net premium of $225,027 for the first quarter of 2010, resulting in an assessment of $1,800 for the first quarter.  Accordingly, the

---

[3] On each quarterly form for 2009, the Division indicated increasing "credit" amounts.  On the form provided for reporting the first quarter of 2009, the Division indicated Amerisure had a credit of $3,178.47 for WCATF purposes (the amount actually overpaid in 2008 based on annual net premium), and Amerisure reported negative net premium (<$1,321,194>).  The Division's form for the second quarter of 2009 indicated Amerisure had a "credit" of $6,481.46.  Amerisure reported negative net premium for the second quarter of 2009 (<$2,990,876>).  The Division's form for the third quarter of 2009 indicated Amerisure had a "credit" of $13,958.65.  Amerisure reported negative net premium for the third quarter of 2009 (<$2,176,521>).  The Division's form for the fourth quarter of 2009 indicated Amerisure had a "credit" of $19,399.95 (the sum of the $3,178.47 2008 overpayment and the total negative net premium reported for the first three quarters of 2009 multiplied by the WCATF assessment rate).  Amerisure again reported a negative net premium for the fourth quarter of 2009 (<$3,549,615>), and takes the position that its "credit" balance should be increased by $8,874, for a total "credit" balance of $28,273.95, even though Amerisure paid no WCATF assessments for the 2009 calendar year.

Division reduced the $3,178.47 credit by $1,800.22, so that the Division's form for the second quarter of 2010 indicated Amerisure had a credit of $1,378.25. For the second quarter of 2010, Amerisure reported positive net premium of $2,011,533, and a corresponding quarterly WCATF assessment of $16,092.26. Amerisure made no payment to the Division with this report, and the Division's form for the third quarter of 2010 indicated Amerisure had a "Prior Balance Carried Forward" of $14,714.01 (the $16,092.26 second-quarter assessment reduced by the remaining credit of $1,378.25).[4]

Procedural History

On September 16, 2012, Amerisure submitted an application for refunds of monies paid to the SDTF and the WCATF from October 26, 2010 through July 26, 2012.[5,6] On January 28, 2013, the Department issued a Notice of Intent to Deny Applications for Refund, saying that "Amerisure received credit totaling

---

[4] Amerisure continued to report positive net premiums for purposes of the WCATF assessments each quarter through June 30, 2012.

[5] Amerisure asserted that as of December 31, 2009, it had $525,566 in "credits" due from the SDTF. Amerisure asserted it was only allowed to apply $99,119.66 of its "credit," and had subsequently paid $236,663.25 "in assessments to the SDTF that the company should not have been required to pay since it had credits that should have been applied against its assessment liability." Amerisure also asserted the "right to apply" $189,783.75 of remaining SDTF "credits" against future assessment liability.

[6] Amerisure alleged it should not have been required to pay the assessments in light of the amount of "credit" it had accrued in 2008 and 2009. Amerisure asserted that as of December 31, 2009, it had $28,273.95 in "credits" due from the WCATF, which "should have been applied against its assessment liability."

8

$99,119.66 for its overpayments to the SDTF in year 2008. Amerisure to date has received, and has been allowed to apply to its subsequent payment obligations, full credit for all overpayments made by it to the SDTF;" and that "Amerisure received credit totaling $3,178.47 for its overpayments to the WCATF in year 2008. Amerisure to date has received, and has been allowed to apply to its subsequent payment obligations, full credit for all overpayments made by it to the WCATF."

The Department took the position that to allow Amerisure to obtain in addition the cash refunds Amerisure requested "would be inconsistent with the provisions" of Sections 440.49(9)(b) and 440.51(1), Florida Statutes. The Department concluded Amerisure was not entitled to any money from the State Treasury or to any "credits" based on the negative net premiums reported during 2009 because it paid no assessments into either the WCATF or the SDTF in 2009.

Amerisure then filed a petition for a formal administrative hearing, challenging the notice of intent to deny its applications for refund, and alleging that unadopted rules were the basis of the notice of intent to deny. Amerisure contended the Department treated "credit balances" accrued in 2009 as "excess credits," which had to be forfeited at the end of the calendar year, and argued section 624.5094 did "not authorize the Department to eliminate accrued credits" or "support the Department's interpretation that no credit can be accrued during a year when no monies are due and paid into the fund(s)."

9

The administrative law judge (ALJ) rejected the Department's position that "credits" based on negative net premiums in 2009 never actually assumed any legal significance. The ALJ cited the entries on the reporting forms sent to Amerisure each quarter and reasoned in her recommended order that the forms indicated "credits" had accrued in 2009. The recommended order recited that Department staff acknowledged "eliminating" the 2009 "credits" when the 2010 quarterly reporting forms were sent to Amerisure.

In the recommended order, the ALJ attributed the Department's denial of refunds to the first of two putative, unadopted rules. The recommended order identified two statements as agency policies that met the definition of a rule but had not been adopted through the rulemaking process: (1) any credits accruing in a calendar year in which net premiums are negative for each quarter are excess credits that are eliminated at year end and cannot be carried over to the next calendar year; and (2) credits can be carried forward for a three-year period from one calendar year to the next as long as the insurer had at least one quarter per calendar year with positive net premium; although after three years the credits are eliminated unless the insurer requests a refund. Finding the Department had not demonstrated circumstances excusing a lack of rulemaking as contemplated by

10

section 120.57(1)(e), the ALJ determined Amerisure was entitled to recover fees and costs pursuant to section 120.595(4)(a), Florida Statutes.

The ALJ determined that a "credit" was created "by Amerisure paying more out in refunds and dividends than it wrote or collected in premium. . . . The Department implicitly acknowledged that reality when it calculated a credit for each quarter in 2009 and included that credit on the forms it forwarded to Amerisure for its quarterly reports." The ALJ recommended that the "Department enter a final order . . . reinstating Amerisure's 2009 credits as credits toward future assessments due to the Trust Funds." But, as the recommended order itself acknowledges, the governing statutes say nothing whatsoever about credits for "paying more out in refunds and dividends" than premiums received in a calendar year or carrying any such putative credits forward.

The ALJ determined the Department's position was "not a simple application of the law to the information provided, because no statute referenced by the Department makes any mention of excess credits and how they are to be treated." The statute makes no mention of "credits," excess or otherwise. Indeed, the ALJ concluded that the Department's elimination of the 2009 "credits" was based on an erroneous interpretation of section 624.5094 on grounds that the provision "does not address credits in any way, and certainly does not mandate that credits be eliminated should a carrier have four quarters in a year where negative

11

premiums were reported." That the statute does not "address credits in any way" led the Department to different conclusions.

## Final Order

The Department rejected the ALJ's view that Amerisure accrued credits that could be applied against subsequent years' SDTF and WCATF assessments as a result of negative net premium in the year 2009. Focusing on the statutes, not the forms, the final order ruled the ALJ had attached "undue significance to the fact that for the 2009 assessment year only, Division employees, acting without statutory authority . . . , supplied Amerisure with a quarterly assessment form that was never promulgated as a rule and that purported to identify 'credits' to which the carrier was entitled. Thus, the ALJ in her Recommended Order makes findings of fact that are technically accurate, but then draws legally erroneous legal conclusions from those facts."

The Department's final order stated the ALJ's legal conclusions were in error because "there is neither statutory nor constitutional authority for the Division to create free-standing tax credits redeemable from the State Treasury for the benefit of a private insurance carrier <u>that paid nothing [for the year 2009] in assessments to the Division</u>." The final order concluded instead:

> Section 624.5094 makes clear that, for annual assessment
> purposes, all statutory deductions from a carrier's "net"
> premium base must be taken in the assessment year in
> which they occur "regardless of the policy year" to which

12

the deductions relate. . . . If . . . a carrier must return more premiums than remain in force during an assessment year, it is entirely foreseeable that a carrier, as did Amerisure in 2009, will have no positive cash flow from which an annual assessment can be paid. The only logical resolution of this situation is for the regulator, as the statute clearly authorizes, to excuse the carrier from its obligation to pay an assessment for the assessment year in question. That is exactly what happened here. The reason it happened was not based upon so-called "credits" issued by the Department, however. The assessment was not imposed because Amerisure had no "net premium" for 2009 that could be assessed.

. . . No action by the Department "eliminates" a carrier's "credits" against its assessment liability for dividends paid and premiums returned when its annual assessment is finalized at [or below] zero. Section 624.5094, Florida Statutes, by operation of law, forecloses a carrier's ability to apply its "excess credits" – that is, the carrier's having made more expenditures for dividends and return premium than were needed to offset the carrier's entire assessment obligations for that year – to reduce a future year's tax liability. This statute simply does not grant the Department independent, extra-statutory discretion to devise and declare additional deductions from a carrier's current or future annual assessment bases, and thereby reduce the amount of tax it owes to the State.

Regarding the purportedly dispositive, unadopted rule, the Department again emphasized that there was no statutory authority for calculating "credits" on the basis asserted by Amerisure, given the plain meaning of section 624.5094: "Simply put, an insurer that has not paid an assessment is not entitled to a refund of a portion of that 'non-assessment' just because it has experienced a 'negative net premium' for an entire assessment year. . . . What the Recommended Order brands

13

as an illicit non-rule policy of 'eliminating' the 'excess credits' ignores that the supposed 'policy' is merely . . . the plain meaning of the applicable statutes."

Analysis

In rejecting the ALJ's conclusions of law, the final order did not ignore or reject any finding of fact the ALJ made. An agency may not reject an ALJ's findings of fact "without first finding, after a review of the entire record, that the ALJ's factual findings were not supported by competent, substantial evidence." Viering v. Fla. Comm'n on Human Relations ex rel. Watson, 109 So. 3d 296, 298 (Fla. 1st DCA 2013). Nor may an agency avoid the obligation "'to honor the [ALJ's] findings of fact . . . by categorizing a contrary finding as a conclusion of law.'" Id. (quoting Pillsbury v. State, Dep't of Health & Rehabilitative Servs., 744 So. 2d 1040, 1041 (Fla. 2d DCA 1999)). But the record in the present case reveals no violation of this "cardinal tenet of administrative law." Id.

The final order discussed the various forms filled out by Amerisure and the Department in the present case in some detail. The fact that the credit based on reported negative net premium in 2008 was carried forward while the "credit" based on 2009 reported negative net premium was not carried forward was addressed head on in the final order:

> Because Amerisure had already paid its 1Q and 2Q 2008 estimated assessments, its total 2008 assessment payments exceeded the revised final assessments for that year, resulting in Department recognition of a $99,119.66

14

overpayment to the SDTF by Amerisure and a $3,178.47 overpayment to the WCATF. Amerisure could have elected to obtain a cash refund of its 2008 overpayment, but elected instead to apply the balance to reduce a future assessment liability, which it ultimately did, by applying its 2008 overpayment to its 2010 assessment.

Amerisure, however, had no assessment liability for 2009 against which Amerisure's overpayment "credit balance" could apply, and no assessment was levied. Put another way, Amerisure had no tax obligation for calendar [year] 2009 that could be offset, in part, by means of its overpayment balance. <u>The record shows that the balance was applied and extinguished the next time Amerisure did have a tax liability to the Department: its calendar [year] 2010 assessments.</u> Thus, Amerisure's actual 2008 tax overpayment was refunded in 2010 in the form of cash equivalent credits redeemable against its pending assessment obligations for 2010. This refund transaction falls squarely within the ambit of Section 215.26, Florida Statutes.

(Internal citations omitted.) That the quarterly forms indicated increasing "credits" during 2009 based on the quarterly reports of negative net premium is not disputed by the Department. The ALJ's statement that the forms "clearly indicated accrued credits," to the extent this references the increasing amount of the "credit" indicated in each succeeding quarter, is a factual finding supported by competent, substantial evidence, a factual finding the Department accepted.

To the extent the ALJ determined Amerisure had "accrued credits" that had "come into existence as an enforceable claim or right" under any set of facts,

15

however, such a determination must necessarily have been a legal conclusion.[7]

See Black's Law Dictionary 21 (7th ed. 1999) (defining "accrue"). At issue here is not what Amerisure reported each quarter in 2009. Instead, as the Department maintains, at issue is the legal significance of Amerisure's negative net premiums in all four quarters of the 2009 calendar year, and its consequent failure to pay assessments that year.

At issue finally is a question of statutory interpretation, as to which the standard of review is de novo. An agency

> "is afforded wide discretion in the interpretation of a statute which it is given the power and duty to administer," Office of Fire Code Official of Collier County Fire Control & Rescue Dists. v. Fla. Dep't of Fin. Servs., 869 So. 2d 1233, 1237 (Fla. 2d DCA 2004) (citation omitted), but nothing requires "that we defer to an implausible and unreasonable statutory interpretation adopted by an administrative agency." Id. "If the agency's interpretation is within the range of possible and reasonable interpretations, it is not clearly erroneous and should be affirmed," Fla. Dep't of Educ. v. Cooper, 858 So. 2d 394, 396 (Fla. 1st DCA 2003), but "judicial adherence to the agency's view is not demanded when it is contrary to the statute's plain meaning." Werner v. Dep't of Ins. & Treasurer, 689 So. 2d 1211, 1214 (Fla.

---

[7] The Department argues that the "credits" indicated on the quarterly forms for 2009 (in excess of the credits based on actual overpayments of assessments in 2008) were simply staff "notations, for bookkeeping purposes . . . to recognize 'potential credits' that could be applied as tax assessment offsets in the event [Amerisure] resumed reporting taxable positive net premiums in 2009. Because, in 2009, Amerisure had no positive earnings and therefore no tax liability from which 'potential credits' could be deducted, the 'potential credits' indicated on the forms had no purpose and were not applied."

16

1st DCA 1997) (quoting <u>PAC for Equal. v. Dep't of State, Fla. Elections Comm'n</u>, 542 So. 2d 459, 460 (Fla. 2d DCA 1989)).

<u>Sullivan v. Fla. Dep't of Envtl. Prot.</u>, 890 So. 2d 417, 420 (Fla. 1st DCA 2004).

Amerisure's contention that a carryforward of a "credit" from a year in which it paid no assessment is necessary in order for it to be made "whole" overlooks the basic fact that the governing statutes levy an assessment on carriers—not on policyholders. <u>See</u> §§ 440.49(9)(b)1., Fla. Stat. (2008) ("The Special Disability Trust Fund shall be maintained by annual assessments <u>upon the insurance companies</u> writing compensation insurance in the state. . . .") (emphasis supplied); 440.51(1)(b), Fla. Stat. (2008) ("The total expenses of administration shall be prorated <u>among the carriers writing compensation insurance</u> in the state and self-insurers. The net premiums collected by carriers . . . are the basis for computing the amount to be assessed.") (emphasis supplied); 440.51(5), Fla. Stat. (2008) ("Any amount so <u>assessed against and paid by an insurance carrier</u> . . . shall be allowed as a deduction against the amount of any other tax levied by the state upon the premiums, assessments, or deposits for workers' compensation insurance on contracts or policies of said insurance carrier . . . .") (emphasis supplied).

The insurance carrier does not act as an agent of the state to collect and remit assessments levied on the employers it insures in the way retailers collect sales

17

taxes their customers owe.[8]  The carrier is itself liable for the assessments. Amerisure contends it has been "unjustly divested" of "over $400,000" that the state had "no legal right to claim," and that the issuance of a legally enforceable "credit" is "necessary to make the carrier whole for having returned the assessment amounts that the carrier paid into the Trust Funds to policyholders." But, even assuming Amerisure paid assessments based on premiums which were subsequently returned to policyholders, Amerisure has not demonstrated that it paid more in assessments than the law requires.

The applicable statutory provisions call for calculating assessments one year at a time. Section 624.5094 only authorizes deductions or offsets "against the current year's net premium" for dividends or premium refunds "in the same calendar year" or "current year" in calculating "that year's assessment" – "regardless of the policy year for which the dividends or premium refunds are being reimbursed." There is no statutory authority for carrying one year's negative net premium forward as an offset against a subsequent year's positive net

---

[8] See, e.g., § 212.12(1)(a)1., Fla. Stat. (2014) ("[F]or the purpose of compensating remitters of any taxes or fees reported on the same documents utilized for the sales and use tax, as compensation for the keeping of prescribed records, filing timely tax returns, and the proper accounting and remitting of taxes by them, such seller, person, lessor, dealer, owner, and remitter . . . shall be allowed 2.5 percent of the amount of the tax due . . . .").

premium.[9]   There is no statutory authority for "credits" against future years'

assessments simply because no assessment was paid during a prior year in which

_____

   [9] Other statutory schemes take different approaches.  See, for example, section 624.5105, Florida Statutes (2014):

> Community contribution tax credit . . .
>
>    (1)  AUTHORIZATION  TO  GRANT  TAX CREDITS; LIMITATIONS.—
>
>    (a)   There shall be allowed a credit of 50 percent of a community contribution against any tax due for a calendar year under s. 624.509 or s. 624.510.
>
>    (b)   No insurer shall receive more than $200,000 in annual tax credits for all approved community contributions made in any one year.
>
>    . . . .
>
>    (e)   If the credit granted pursuant to this section is not fully used in any one year because of insufficient tax liability on the part of the insurer, the unused amount may be carried forward for a period not to exceed 5 years. The carryover credit may be used in a subsequent year when the tax imposed by s. 624.509 or s. 624.510 for such year exceeds the credit under this section for such year.

(Boldface omitted.)  See also § 212.17, Florida Statutes (2014):

> [Sales] Tax credits or refunds.—
>
>    (1)(a)   If purchases are returned to a dealer by the purchaser or consumer after the tax imposed by this chapter has been collected from or charged to the account of the consumer or user, the dealer is entitled to reimbursement of the amount of tax collected or charged by the dealer, in the manner prescribed by the department.
>
>    . . . .
>
>    (c)   If the tax has not been remitted by a dealer to the department, the dealer may deduct the same in submitting his or her return upon receipt of a signed statement by the dealer as to the gross amount of such refunds during the period covered by the signed statement, which may not

net premium was negative. Absent statutory authority, the Department has no discretion to allow a reduction in the annual total subject to the assessments.

For all the same reasons, the Department did not err in rejecting the ALJ's conclusion that the Department improperly applied unadopted rules to "eliminate" Amerisure's 2009 "excess credits." An "unadopted rule" is "an agency statement that meets the definition of the term 'rule,' but that has not been adopted pursuant to the requirements of" section 120.54, Florida Statutes. § 120.52(20), Fla. Stat. (2014). "Rule" means "each agency statement of general applicability that

---

be longer than 90 days. The department shall issue to the dealer an official credit memorandum equal to the net amount remitted by the dealer for such tax collected or paid. Such memorandum shall be accepted by the department at full face value from the dealer to whom it is issued upon the remittance of subsequent taxes accrued under this chapter. If a dealer has retired from business and filed a final return, a refund of tax may be made if it can be established to the satisfaction of the department that the tax was not due.

    (2)   A dealer who has paid the tax imposed by this chapter on tangible personal property sold under a retained title, conditional sale, or similar contract, or under a contract in which the dealer retains a security interest in the property pursuant to chapter 679, may take credit or obtain a refund for the tax paid by the dealer on the unpaid balance due him or her when he or she repossesses the property, with or without judicial process, within 12 months after the month in which the property was repossessed. If such repossessed property is resold, the sale is subject in all respects to the tax imposed by this chapter.
(Boldface omitted.)

implements, interprets, or prescribes law or policy or describes the procedure or practice requirements of an agency and includes any form which imposes any requirement or solicits any information not specifically required by statute or by an existing rule." § 120.52(16), Fla. Stat. (2014). The term "rule" does not include "[i]nternal management memoranda which do not affect either the private interests of any person or any plan or procedure important to the public and which have no application outside the agency issuing the memorandum." § 120.52(16), (16)(a). See State Bd. of Admin. v. Huberty, 46 So. 3d 1144, 1147 (Fla. 1st DCA 2010) ("We have held that "'[a]n agency statement that either requires compliance, creates certain rights while adversely affecting others, or otherwise has the direct and consistent effect of law is a rule.'" (quoting Fla. Dep't of Fin. Servs. v. Capital Collateral Reg'l Counsel-Middle Region, 969 So. 2d 527, 530 (Fla. 1st DCA 2007))).

"An agency . . . may not base agency action that determines the substantial interests of a party on an unadopted rule." § 120.57(1)(e)1., Fla. Stat. (2014). The Department did not do so here.[10] The Department simply applied the governing

---

[10] We note, however, the Department's subsequent adoption of Rule 69L-4.002, Florida Administrative Code, during the pendency of the appeal, which provides:

> (1) For purposes of its quarterly WCATF assessments under this rule, a carrier or self-insurance fund may offset from its total of premiums collected during the quarter all amounts actually paid or credited to

21

statute to the information Amerisure reported. As the Department said in its final order, pursuant to section 624.5094, "annual assessments are, indeed, annual and are the product of a carrier's premium experience for that year, and that year only. The ALJ fails to accord any meaning to the statutory phrase 'against the current year's net premium for that year's assessment' . . . . No action by the Department 'eliminates' a carrier's 'credits' against its assessment liability for dividends paid and premiums returned when its annual assessment is finalized at zero. Section 624.5094, Florida Statutes, by operation of law, forecloses a carrier's ability to

---

policyholders for dividends and returned premiums during the quarter regardless of the calendar year the policies incepted for which the dividends or returned premiums apply. For purposes of its quarterly SDTF assessments under this rule, a carrier or self-insurance fund may offset from its total amount of premiums written during the quarter, all amounts actually paid or credited to policyholders for dividends and returned premiums during the quarter regardless of the calendar year the policies incepted for which the dividends or premiums apply.

(2) In the event a carrier or self-insurance fund is determined by the division to have overpaid its annual WCATF or SDTF assessment, the amount of any actual overpayment deposited into the State Treasury may, at the option of the carrier or fund, be carried forward as a dollar-for-dollar credit against future assessment liabilities; or be refunded by the division. No carrier or self-insurance fund shall be entitled to credits that exceed the assessment amounts actually paid for the specific calendar year to which the assessments apply.

22

apply its 'excess credits' . . . to reduce a future year's tax liability."[11]

Statements in the proposed draft rules and draft policy and procedures manual[12] do not require compliance by anybody outside the agency, do not create

---

[11] The Department's position is also consistent with the plain language of section 215.26, Florida Statutes (2008), regulating refunds. Section 215.26 provides, in part:

> (1) The Chief Financial Officer may refund . . . any moneys paid into the State Treasury which constitute:
> (a) An overpayment of any tax, license, or account due;
> (b) A payment where no tax, license, or account is due; and
> (c) Any payment made into the State Treasury in error . . . .
> (2) Application for refunds as provided by this section must be filed with the Chief Financial Officer, except as otherwise provided in this subsection, within 3 years after the right to the refund has accrued or else the right is barred. . . .

[12] A Division employee drafted proposed rules for the Division's Assessment Unit, which addressed "excess credits" based on negative net premium. One draft of the proposed rules provided that if a carrier owes no assessment for a quarter as a result of offsets for dividends paid and premium refunds, the carrier will be able to apply the "unused premium offset to reduce assessments owed in any of the other three quarters of the same calendar year," but after the last quarterly report is filed for a calendar year the Division would "adjust the Carrier's records to remove any credits due to these premium offsets that were not used in that year" and the credit pre-printed on the quarterly report for the first quarter of the following year would "reflect only overpayment of assessment(s)." This draft of the proposed rules also provided that when an assessment for either the WCATF or SDTF was overpaid, the carrier could elect either to apply the overpayment against future assessments owed to the same fund or submit a refund request under section 215.26, Florida Statutes, within three years of the date the alleged overpaid amount was initially deposited into the State Treasury; after the end of the three-year window, any unused portion of an overpayment would no

23

certain rights while adversely affecting others, or otherwise have the direct and consistent effect of law, or add anything whatsoever to the plain meaning of section 624.5094. Similarly, the Division's forms, which indicated increasing "credits" throughout the year 2009, also did not "adversely affect any . . . substantive rights; [did] not constitute a denial or withdrawal of a right an [insurance carrier] might have; [did] not impose any new or additional requirements on an [insurance carrier]; and [did] not have 'the direct and consistent effect of law.'" Huberty, 46 So. 3d at 1147. "'[A]n agency interpretation of a statute which simply reiterates the legislature's statutory mandate and does not

longer be available as an offset against future assessments or for the issuance of a refund.

In explanation of the conclusion that these findings established statements of policy that constituted unadopted rules, the ALJ stated only that the Department had held the stated position "at least since 2004" and "the Department's position is not a simple application of the law to the information provided, because no statute referenced by the Department makes any mention of excess credits and how they are to be treated." The fundamental problem with the ALJ's conclusion is that section 624.5094 precludes carrying forward negative net premium from one calendar year to a subsequent calendar year, thereby precluding the "credits" at issue in the first place.

The fact that "credit" calculations based on Amerisure's 2009 quarterly reports of negative net premium appeared on the quarterly assessment forms was not sufficient to establish that Amerisure had a statutorily authorized entitlement to such "credits" so that the Department was required to establish authority (by statute or rule) to "eliminate" the credits. The notation of credits (or debits) on the Division's pre-printed forms appears to be a bookkeeping device to carry forward information from one quarter to the next, a result of the fact that the assessments at issue are actually annual assessments even though the statutes set forth quarterly reporting requirements. It is therefore both irrelevant and completely understandable that nothing in section 624.5094 "mandates that credits be eliminated under any circumstances."

24

place upon the statute an interpretation that is not readily apparent from its literal reading, nor in and of itself purport to create certain rights, or require compliance, or to otherwise have the direct and consistent effect of the law, is not an unpromulgated rule, and actions based upon such an interpretation are permissible without requiring an agency to go through rulemaking.'" Id. (quoting St. Francis Hosp., Inc. v. Dep't of Health & Rehabilitative Servs., 553 So. 2d 1351, 1354 (Fla. 1st DCA 1989)).

The Department's construction and application of section 624.5094 in the present case is consistent with and required by the statute. No unadopted rule need be conjured up to explain the Department's denial of refunds to Amerisure, and the final order did not err in concluding as much.

Affirmed.

LEWIS, C.J. and RAY, J., CONCUR.