# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D16-1969
_____

LEE MEMORIAL HEALTH SYSTEM
GULF COAST MEDICAL CENTER,

    Appellant,

    v.

STATE OF FLORIDA, AGENCY FOR
HEALTH CARE ADMINISTRATION,

    Appellee.

_____

On appeal from a Final Order of the Agency for Health Care Administration.
Elizabeth Dudek, Secretary.

February 27, 2019


M.K. THOMAS, J.

Lee Memorial Health System Gulf Coast Medical Center ("Gulf Coast") challenges a final order of the Agency for Health Care Administration ("the Agency"), which found it was overpaid with Medicaid funds for in-patient emergency services rendered to Medicaid eligible undocumented aliens. Gulf Coast argues the Agency was without authority to order reimbursement as it was barred from conducting retrospective audits on claims for emergency in-patient services that were pre-authorized and paid. We agree and reverse.

*I. FACTS*

In 2002, exercising authority under section 409.905(5)(a), Florida Statutes, the Agency implemented a mandatory pre-authorization program regarding Medicaid hospital in-patient services, including emergency services provided to undocumented alien recipients. The new program required medical providers to acquire authorization either during or before provision of the emergency medical services. Only those claims for hospital in-patient services that had received pre-authorization with a pre-authorization verification number could be submitted to the Agency for payment.[1]

In 2006, Gulf Coast entered into a Medicaid Provider Agreement ("the Agreement") with the Agency to participate in the Florida Medicaid program. Gulf Coast billed Medicaid in 2007 for emergency in-patient services provided to undocumented aliens. Gulf Coast followed the required procedures, inclusive of acquisition of pre-authorization for the medical services subsequently provided and billed to Medicaid. As part of the pre-authorization process, the Department of Children and Families ("DCF") provided Gulf Coast with a pre-authorization number signifying each undocumented alien was qualified and eligible for Medicaid, suffered from an emergency medical condition, and approved the estimated duration of emergent care. The Agency reviewed the claims submitted by Gulf Coast and issued payment.

In 2009, under its compliance and monitoring authority, the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services

---

[1] Prior to 2002, medical providers were not required to obtain pre-authorization of emergency in-patient hospital services in order to ensure payment. Following provision of medical services, but before making any payments to medical providers, the Agency would review submitted claims to ensure, (1) the recipient was Medicaid eligible per Florida's Department of Children and Families ("DCF"); (2) the services were medically necessary; and (3) the services were for treatment of the emergency medical condition previously approved by DCF.

("HHS"), conducted a review of Florida's Medicaid expense reports. CMS concluded Florida was claiming federal funding for emergency medical services "beyond what federal regulations defined to be an emergency." Specifically, the standard utilized by the federal government to determine what constitutes an "emergency medical condition" requiring "emergency medical services" was more restrictive than that used by DCF. CMS recommended the Agency review and re-determine the allowability of claims for all emergency services for undocumented aliens during fiscal years 2005, 2006, and 2007. Further, based on this review and redetermination, CMS recommended the Agency revise previous amounts claimed to reflect only emergency services to undocumented aliens "to the point of stabilization."

In response to the CMS federal audit, the Agency initiated the Undocumented Alien Project ("the Project"). Under the flag of the Project, the Agency began audits of all paid in-patient hospital claims for emergency services provided to alien recipients in Florida between July 2005 and June 2010.

In 2011, Gulf Coast received notice from the Agency, through its Bureau of Medicaid Program Integrity ("MPI"), it would audited regarding claims for in-patient hospital services provided to undocumented aliens and billed to Medicaid in 2007. The purpose of the audit, according to the Agency, was to determine whether the claims were billed and paid in accordance "with Medicaid policy." Following review of the claims, the Agency issued a Final Audit Report holding Gulf Coast was overpaid by $46,901.85 for in-patient services rendered to Medicaid eligible undocumented aliens post alleviation of an emergency medical condition and found the overpayment to be subject to recoupment.[2]

In response, Gulf Coast filed a petition for formal administrative hearing to challenge the finding of overpayment.

---

[2] The Agency first notified Gulf Coast of its preliminary audit results estimating an overpayment amount of $100,588.07. This was later amended to $79,917.50 inclusive of fines and costs. At the time of hearing, the Agency asserted an overpayment amount of $46,901.85.

Following the hearing, the administrative law judge ("ALJ") determined the Agency had exceeded the scope of its authority as there was no provision in chapter 409, Florida Statutes, granting the Agency the authority to decide whether the recipient had an emergency medical condition – a decision exclusively within the authority of DCF and which had been previously reviewed and authorized. However, the Agency rejected the findings and conclusions of the ALJ. The Agency held that overpayments in the audit report, which were based on its determination of the existence and duration of an emergency medical condition, were recoverable pursuant to its Coverage and Limitations Handbook, which limited eligibility to only duration of the emergency until it was "alleviated." The Agency ordered reimbursement by Gulf Coast, plus interest. Gulf Coast appealed.

## II. FEDERAL AND STATE ADMINISTRATIVE STRUCTURE

"Medicaid is a jointly financed federal-state cooperative program . . . States devise and fund their own medical assistance programs, subject to the requirements of the Medicaid Act, and the federal government provides partial reimbursement." *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (citing 42 U.S.C. §§ 1396b(a), 1396d(b)). CMS is responsible for administering the Medicaid Act, including setting state guidelines and monitoring state compliance. *Moore*, 637 F.3d at 1235-36 (citing 42 U.S.C. § 1396a(b), 42 C.F.R. §§ 430.10, 430.15). CMS may recoup from the state any overpayments that were made, even if the state is unable to recover that amount from the provider. 42 C.F.R. § 433.300.

The U.S. government pays federal financial participation ("FFP") to participating states on a quarterly basis. For their part, the states must submit quarterly expense reports to the U.S. government, in effect claiming FFP or, more loosely, "billing" the federal government for Medicaid costs. If the federal government believes it has overpaid a state, it may disallow claims for FFP and recover the amount of overpayment from the state. The state is entitled to pursue an administrative appeal, before the appropriate federal agency, of any disallowance it disputes. *See* 42

4

U.S.C. § 1316(e). Florida receives FFP funding to cover a percentage of its Medicaid program expenditures.

Federal law broadly prohibits compensating a state through FFP under the Medicaid program "for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." 42 U.S.C. § 1396b(v)(1). However, it permits FFP for services provided undocumented aliens that "are necessary to treat an emergency medical condition" if the individual otherwise meets the conditions for participation in the Medicaid program. 42 C.F.R. § 40.255(a); *see also* 42 U.S.C. § 1396b(v)(2). In fact, federal law mandates that state Medicaid programs provide services necessary to treat an undocumented alien's emergency medical condition. 42 U.S.C. § 1396(b)v.

Florida enacted legislation consistent with federal law. *See* §§ 409.902(2)(b), 409.904(4), Fla. Stat. Florida statutes and rules, with minor variations, incorporate the federal standards limiting the eligibility of undocumented aliens to treatment for emergency medical conditions. Florida law sets forth "Provider Requirements" and establishes that all Medicaid providers enrolled in the Medicaid program and billing agents who submit claims to Medicaid on behalf of an enrolled Medicaid provider must comply with the provisions of the Florida Medicaid Provider General Handbook. Fla. Admin. Code R. 59G-4.150. The "Handbook" contains a section entitled "Emergencies: Medicaid for Aliens," also known as the "Statement on the Eligibility of Aliens for Services" or "SEAS," which provides, in pertinent part:

> The Medicaid Hospital Services Program reimburses for emergency services provided to aliens who meet all Medicaid eligibility requirements except for citizenship or alien status. Eligibility can be authorized only for the duration of the emergency. Medicaid will not pay for continuous or episodic services after the emergency has been *alleviated*. (emphasis added).

Florida law designates DCF as responsible for determining eligibility for Medicaid. § 409.902(1), Fla. Stat. The Agency "is designated as the single state agency authorized to make

payments" under Medicaid. § 409.902(1), Fla. Stat. Participating medical providers seek reimbursement from the Agency for services provided to Medicaid eligible patients. *Id*. Florida law permits the Agency to review these claims two ways: by conducting pre-payment reviews of provider claims before paying the provider; and/or, by conducting post-payment reviews/audits to identify any overpayments. § 409.13(3), (5), Fla. Stat. The latter method is routinely referred to as the "pay and chase" method in which the Agency reviews claims after payment using "peer reviews" by medical professionals to determine whether the services provided were medically necessary and otherwise permitted by Medicaid. §§ 409.913(1)(d)-(e), (2), (5), (7); 409.9131(2)(b), (2)(d), Fla. Stat. As a result of this pay and chase option, medical providers must maintain records for a period of five years for the Agency to audit for overpayment and seek reimbursement from medical providers. § 409.913(9), Fla. Stat.

Before and after the prior authorization program was implemented in 2002, DCF has been responsible for making Medicaid eligibility determinations based on information submitted by providers. Conversely, the Agency's assigned Medicaid role is to determine the medical necessity of the services rendered to treat the emergency medical condition. § 409.902, Fla. Stat. Prior to 2002, if the Agency regarded the treatment as medically necessary, the claims were approved and paid by the Agency. In 2002, as required by statute, the Agency began a prior authorization program for Medicaid inpatient hospital services. The purpose was to determine, before payment, if services were medically necessary. DCF assigned the limited eligibility period for the duration of the emergency, which was the date of admittance through the date of discharge. Until 2010, the Agency accepted DCF's determination of the emergency medical condition and the period of eligibility or duration of that emergency medical condition. However, as a result of the CMS review and audit in 2009, the Agency changed its procedures. After July 1, 2010, the Agency announced it would begin applying a new standard to claims for undocumented aliens. Instead of reviewing solely for "medical necessity," the Agency would only reimburse for services up to the patient reaching the point of "stabilization." In essence, the Agency announced it was expanding its evaluation to also

6

address duration of the emergency medical condition – a determination historically made solely by DCF.

The Agency began audits and applied this new "stabilization standard" retroactively to claims that had already been paid prior to July 1, 2010, seeking to recoup money from the hospitals. In response, the medical providers initiated litigation, arguing the Agency was improperly operating under an unpromulgated rule by applying a "stabilization standard." *See Bayfront v. AHCA,* Case No. 12-2757RU (Fla. DOAH Dec. 21, 2012), *appeal dismissed, AHCA v. Bayfront Medical Ctr.*, 145 So. 3d 888 (Fla. 1st DCA 2014) ("Bayfront I"). The Agency defended by arguing the stabilization standard was not new, but it simply began enforcing, at the direction of the federal government, a reasonable interpretation of existing law, which permits payment only for the "duration" of the emergency and not past the point of "alleviation." The Agency asserted that until July 1, 2010, there was no system, procedure, or practice for determining when the duration of an undocumented alien's emergency ended or when the emergency was alleviated, other than the initial determination of eligibility.

The Final Order in *Bayfront I* determined the Agency's application of the "stabilization standard" was an unadopted rule and prohibited its further use.[3] The issue of jurisdictional confines of DCF versus the Agency regarding the determination of "duration" of the emergency medical condition was not specifically addressed.

After *Bayfront I*, the Agency embarked upon a course of action to conduct retrospective and prospective reviews of hospital in-patient claims for Medicaid payments relying only on existing statutes and rules. The Agency developed new guidelines for peer reviewers. It provided peer reviewers with provisions of the Florida Medicaid Handbooks that have been incorporated by reference into the Agency's rules. The Agency expected the

---

[3] The Agency appealed the determination; however, ultimately voluntarily dismissed the appeal after oral argument, but before an opinion was released. *Bayfront Medical Ctr., Inc.*, 145 So. 3d 888.

reviewers to apply their "education, clinical expertise, and experience to determine if services provided were 'emergency services or treatment,'" as defined in section 409.901(11) for an "emergency medical condition," as defined in section 409.901(10).

The Agency's amended guidelines for peer reviewers lead to the inevitable sequel to *Bayfront I*. *Bayfront Medical Ctr., et al. v. AHCA*, DOAH Case No. 14-4758RU (Fla. DOAH June 28, 2016), *aff'd*, *Bayfront v. AHCA*, 192 So. 3d 472 (Fla. 1st DCA 2016) ("Bayfront II"). In *Bayfront II*, the medical providers again challenged the Agency's methods as unpromulgated rules. However, the ALJ found that the use of an "alleviation standard" by peer reviewers was discernably different from the prior "stabilization standard," in that it was not treated as an unadopted rule throughout the Agency. The new alleviation standard was allowed where it was applied in a plain and ordinary sense and was not enforced by the Agency as a hardline standard.

In this case, we further analyze the scope of Agency authority, albeit limited in context to Agency review of claims for emergency inpatient hospital services that were pre-authorized and paid.

### III. ANALYSIS

On January 8, 2019, the newly enacted article V, section 21, of the Florida Constitution took effect. According to the amendment, "[i]n interpreting a state statute or rule, a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo." Art. V, § 21, Fla. Const. (2019). Prior to the passage of article V, section 21, administrative agencies were afforded wide discretion in the interpretation of a statute, and an agency's interpretation of a statute it has authority to administer was not overturned on appeal unless clearly erroneous. *Amerisure Mut. Ins. Co. v. Fla. Dep't of Fin. Servs.*, 156 So. 3d 520, 529 (Fla. 1st DCA 2015); *Sullivan v. Fla. Dep't of Envtl. Prot.*, 890 So. 2d 417, 420 (Fla. 1st DCA 2004). We recognize that questions may arise as to whether the newly enacted amendment should be retroactively applied. Here, we decline to address the question as it is not necessary to our legal analysis, because even if deference

8

were provided to the Agency's interpretation of the statute, "judicial adherence to the Agency's view is not demanded when it is contrary to the statute's plain meaning," as is the case here. *PAC for Equality v. Dep't of State, Fla. Elections Comm'n*, 542 So. 2d 459, 460 (Fla. 2d DCA 1989), *quoted in Werner v. Dep't of Ins. & Treasurer*, 689 So. 2d 1211, 1214 (Fla. 1st DCA 1997); *see also Kessler v. Dep't of Mgmt. Servs., Div. of State Grp. Ins.*, 17 So. 3d 759, 762 (Fla. 1st DCA 2009) ("Judicial deference never requires that courts adopt an agency's interpretation of a statute or rule when the agency's interpretation cannot be reconciled with the plain language of the statute. . .").

### A. Retrospective Review is Contrary to the Plain Language of Section 409.905(5)(a), Florida Statutes.

Section 409.905 was amended to provide the Agency, for the first time, the authority to condition payment for inpatient hospital services upon a pre-payment review, which was referred to as prior authorization. The statute, as amended, specifically provides:

> The agency shall pay for all covered services provided for the medical care and treatment of a recipient who is admitted as an inpatient by a licensed physician or dentist to a hospital licensed under part I of chapter 395. However, the agency shall limit the payment for inpatient hospital services for a Medicaid recipient 21 years of age or older to 45 days or the number of days necessary to comply with the General Appropriations Act.
>
> (a) The agency may implement reimbursement and utilization management reforms to comply with any limitations or directions in the General Appropriations Act . . . *Upon implementing the prior authorization program for hospital inpatient services, the agency shall discontinue its hospital retrospective review program.*

§ 409.905(5), Fla. Stat. (emphasis added). Prior to this grant of authority, the Agency paid claims prior to any review; however, it later conducted a retrospective review on a percentage of all claims to determine if they had been properly paid. If upon retrospective

9

review the Agency suspected fraud or abuse, the claim was referred to its MPI office, which only conducted reviews on claims that appeared to be outliers or had abnormal billing patterns. MPI's function was to investigate possible Medicaid abuse; MPI did not conduct general retrospective reviews.

Section 409.905, clearly advises that for hospital inpatient services, upon implementing the new authorization program, "*the agency shall discontinue its hospital retrospective review program.*" § 409.905(5)(a), Fla. Stat. (emphasis added).[4] Pursuant to the new statutory bar to retrospective reviews, the Agency stopped conducting general retrospective reviews of hospital in-patient claims in 2002, but continued to permit MPI to conduct limited retrospective reviews where fraud or abuse was suspected. It is clear that in 2002, the Agency understood that general retrospective reviews were prohibited under the amended statute when it advised all providers, "[t]he new inpatient prior authorization program will involve concurrent review . . . *thus rendering obsolete the retrospective reviews.*" The Project, however, was a review of "*all* the alien . . . claims for *all* hospital providers during this time period" not specifically targeted to fraud or abuse and contrary to the plain reading of the statute.

Thus, the ALJ's conclusion that the Agency's retrospective audit on claims for emergency in-patient services provided to undocumented aliens was the type of review prohibited by section 409.905(5)(a) is not only supported by a plain reading of the statute, but is also supported by the record evidence of the Agency's claim review history. The Agency acknowledges that the Project was a review of all inpatient claims for undocumented aliens, but it opines section 409.905(5)(a) is not controlling because the retrospective review was conducted by MPI. Yet, the statute does not distinguish among the Agency's different offices nor does

---

[4] Of note, the prohibition of section 409.905(5)(a) applies only to claims for in-patient hospital services. *Ex post facto* audits of paid Medicaid claims are commonplace but unlike the typical retrospective review, the Project involves the attempted re-adjudication of claims that were previously authorized on a prospective basis.

the office that conducts the review necessarily dictate the type of audit being conducted. Here, the plain reading of the statute makes clear that the Agency is barred from conducting general retrospective reviews of claims, which the Project commanded.[5] We find no ambiguity in the prohibition on retrospective review in section 409.905(5)(a).

## B. Section 409.913, Florida Statutes, Does not Provide the Agency Authority to Conduct General Retrospective Reviews.

The Agency also argues on appeal it had authority to conduct the retrospective audit pursuant to section 409.913.[6] The Agency interprets section 409.913 as requiring it to seek reimbursement of any overpayment to providers, and this can only be accomplished via retrospective audits. However, overpayment is defined as "any amount *not authorized to be paid* by the Medicaid program, whether paid as a result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." § 409.913(1)(e), Fla. Stat. (emphasis added). Post 2002, the amended statute required medical providers to obtain pre-authorization from the Agency before the inpatient medical services were provided to undocumented aliens. Following treatment, the medical provider sent the Agency the bill for the pre-approved services. The Agency then reviewed the bill and issued payment. Essentially, the Agency now argues another

---

[5] We note that it is appropriate for the Agency to determine whether, for example, the services for which payment is sought is medically necessary to treat the emergency medical condition. However, the Agency must accept DCF's finding that the recipient's condition was an emergency medical condition, as well as all other findings in support of eligibility, including the duration of the emergency medical condition.

[6] Section 409.913 provides in pertinent part: "The Agency shall operate a program to oversee the activities of Florida Medicaid recipients, and providers and their representatives, to ensure that fraudulent and abusive behavior and neglect of recipients occur to the minimum extent possible, and to recover overpayments and impose sanctions as appropriate." Section 409.913, Fla. Stat.

11

review or repetitive audits are allowable under 409.913. While we agree section 409.913 does allow retrospective audits, it is only in the context of claims not previously reviewed and where fraudulent acts are suspected.

Although we recognize section 409.913 provides the Agency the authority to audit claims under certain circumstances, it does not provide the Agency the authority to implement a sweeping retrospective review plan inclusive of hospital inpatient services to undocumented aliens. *See Diaz v. State of Fla., Agency for Health Care Admin.*, 65 So. 3d 78, 82 (Fla. 3d DCA 2011) (holding that to further the objectives of 409.913 the Legislature requires agencies to respond when a provider engages in fraudulent or abusive practices). We do not address what factors trigger an audit under section 409.913 as that is not necessary for our analysis or conclusion given no allegations of fraud or abuse were raised.[7]

We reject the Agency's argument that its duty to maintain Medicaid program integrity would be seriously undermined if administrative finality prevented it from auditing paid claims. Administrative finality should not bar the retrospective review of all paid claims; rather, in the absence of fraud or abuse, it bars the reopening of all adjudicated paid claims, which were previously determined on the merits to be compensable. When the Agency determines compensability for prior authorization, it is not expected to simultaneously investigate the provider for possible wrongdoing, such as fraud or misrepresentation. These matters are clearly distinguishable, and such matters may be explored by the Agency retrospectively in connection with adjudicated claims.

In that section 409.905's prohibition only applies to hospital inpatient services that are subject to prior authorization review, the ALJ's interpretation leaves intact the Agency's authority to conduct retrospective reviews for all other matters, including reviews of prior authorized claims to determine if the claim for prior authorization was materially false. § 409.913(15)(i), (16)(c),

---

[7] The Agency did not argue the audit was conducted on a random basis pursuant to section 409.913(2), Florida Statutes.

Fla. Stat. As such, the ALJ's interpretation does not render the review function meaningless and preserves both statutes.[8]

## C. Statute of Limitations.

Gulf Coast argues the audits for overpayment are barred by Chapter 95, Florida Statutes, which requires an action arising out of statutory liability to be brought within four years of the date the cause of action accrues. § 95.11(3)(f), Fla. Stat. A cause of action accrues when the last element of the action has been met. § 95.031(1), Fla. Stat. Here, Gulf Coast's final bill for the claims at issue was submitted approximately eight years prior to the Agency's retrospective determination it had overpaid. The Agency defends that Chapter 95 does not apply to administrative proceedings unless the action is a direct substitute for a civil action. That exception does not apply here. There is no federal or state statute that requires Medicaid overpayments to be audited within a certain period of time. *See Horta v. Dep't of Children Families*, 911 So. 2d 139, 140 (Fla. 3d DCA 2005). We hold the statute of limitations does not apply, because the instant case is a quasi-judicial administrative proceeding. The case is similar to *Horta*, in that an overpayment of federal funds was alleged, and the recovering entity sought recovery of the overpayment. Further, applying a statute of limitations to review of claims allowed under section 409.913 would be inequitable. Actual instances of fraud or abuse of the Medicaid system could take significant amounts of time to discover and allege, and federal Medicaid funds could reasonably go unrecovered as a result.

---

[8] The Agency also argues it has the ability to conduct retrospective reviews pursuant to SEAS to evaluate "alleviation" of an emergency medical condition and deny payment for medical services falling outside its determined timeline – a determination not usurping that of DCF under "eligibility" review. This issue need not be addressed as it is rendered moot by section 409.905(5)(a), which clearly forbids retrospective reviews of paid inpatient hospital claims for undocumented aliens. The validity of the Agency's retrospective audit of paid claims in cases not involving inpatient hospital services to undocumented aliens is not before us.

Notwithstanding the foregoing, even if Chapter 95's statute of limitations were applicable, the audit would not be time-barred. The cause of action does not accrue until the last element constituting the cause of action occurs. In overpayment actions, the final element is the identification of the overpayment amount, which occurs with the initiation of the Final Audit Report. In the instant case, the statute of limitations never actually began running because the last element and the initiation of the action occurred simultaneously.

## IV. CONCLUSION

In conclusion, the Agency erroneously relied upon section 409.913 as providing it authority to conduct general retrospective reviews of claims for emergency in-patient services provided to undocumented aliens that had previously been authorized and paid. The plain language of section 409.905(5)(a), as well as the Agency's claim review history, specifically bars such retrospective reviews. Thus, the Agency was without authority to conduct the retrospective review and to order Gulf Coast to reimburse what the Agency considered to be overpayment. Accordingly, we reverse the order on appeal.

REVERSED and REMANDED for entry of an order consistent with this opinion.

B.L. THOMAS, C.J., and JAY, J., concur.

––––––––––––––––––––––––

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

––––––––––––––––––––––––

Joanne B. Erde and Donna Holshouser Stinson of Duane Morris LLP, Miami, for Appellant.

Tracy Cooper George of the Agency for Health Care Administration, Tallahassee, for Appellee.

14